**CARNEY BATES & PULLIAM, PLLC**
Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorney for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MONICA CHARLES, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

CASE NO.:

**CLASS ACTION COMPLAINT**

Plaintiff Monica Charles ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Meta Platforms, Inc. ("Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. On June 3, 2025, cybersecurity researchers revealed a novel covert tracking method deployed by Meta against Android users.[1] The researchers found that Meta has been circumventing Android smartphones' "sandbox" design and de-anonymizing users' web browsing data in order to connect it with their Facebook and Instagram accounts, specifically identifying the Android users. This allows Meta to spy on the users' browsing activities and craft detailed user profiles that it employs in its advertising business for its own profits.

2. Meta's main source of income is derived from social media advertisements. Meta's model depends on collecting detailed user data to build identity profiles for Facebook users, allowing advertisers to reach specific audiences. The less anonymous users are, the more detailed their identity profiles become, and the more they can be targeted with advertisements on Facebook and Instagram: thus, the more valuable Meta's data becomes.

3. Meta's spying techniques shocked its peers in the tech space with its invasiveness and disregard for consumer expectation and industry-wide privacy norms.[2] A representative of Google, which makes Android devices, told tech news outlet Ars Technica that the practice "blatantly violate[s] our security and privacy principles."[3] Mozilla told the reporter that "[b]ased on what we've seen so far, we consider these to be severe violations of our anti-tracking policies, and are assessing solutions to protect against these new tracking technologies."[4] Other web

---

[1] Girish et. al., *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, LOCAL MESS, (Jun. 3, 2025) https://localmess.github.io/.

[2] Dan Goodin, *Meta And Yandex Are De-Anonymizing Android Users' Web Browsing Identifiers*, Ars Technica (Jun. 3, 2025), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.

[3] *Id.*

[4] *Id.*

browser developers, including DuckDuckGo and Brave, are actively trying to mitigate the techniques despite experts' warnings that their ability to do so over the long term could "become ineffective at any time."[5]

4. By de-anonymizing data making Android users identifiable, unsurprisingly, Meta exponentially increased the value of the data it collects.

5. Like other members of the class, Plaintiff—an Android mobile phone owner and Facebook and Instagram user—was affected by Meta's pervasive tracking practices.

6. Accordingly, Plaintiff, individually and on behalf of the Classes, brings this action to enforce her privacy rights and seek damages for the harm Meta caused by the collection, deanonymization, and sale of her personal information.

## THE PARTIES

7. Plaintiff Charles is a resident of the state of California and resides in Bakersfield, California. Plaintiff Charles is an Android user with a Facebook and an Instagram account who, like other members of the Class, was affected by Meta's unlawful data collection practices.

8. Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025.

## JURISDICTION AND VENUE

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District.

10. The Court has general personal jurisdiction over Defendant because Defendant resides in and does business in the State of California, with its principal place of business in California.

11. The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2) because the amount in

[5] *Id.*

controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which one or more Class members are citizens of states different from Defendant.

## FACTUAL ALLEGATIONS

### A. The Meta Platform and the Meta Pixel

12. Meta is a "real identity platform"[6] that makes most of its revenue from its advertising business[7]. Meta sells advertising space on the social media and technology platforms it operates by highlighting its ability to target users. In 2023, Meta generated over $131 billion in annual revenue, much of which was due to advertising.[8]

13. Because Meta surveils user activity both on and off its site, Meta can make inferences about users beyond what they explicitly disclose, like their "interests," "behaviors," and "demographics."[9]

14. Meta compiles the information it collects into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

15. To this end, Meta operates a "walled garden." This is "a closed platform where the publisher or technology provider controls access to hardware, applications, content, and user data. In this environment, all advertising activities—from ad buying and serving to measurement and reporting—take place exclusively within the platform's ecosystem."[11]

16. "Walled gardens emerged as a strategy by major tech companies such as Google, Meta, and Amazon to monetize their vast amounts of first-party data by charging advertisers for

---

[6] *Community Standard: Authentic Identity Representation*, Meta, https://tinyurl.com/37rrzynp (last visited July 7, 2025) (Users are only allowed one Facebook account under the "name they go by in everyday life."). Additionally, a user is required to submit their first and last name, e-mail address, birthday and gender to create an account. *See Sign Up,* Meta, https://www.facebook.com/signup. (last visited July 7, 2025).

[7] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, Wall St. J. (Oct. 21, 2021), https://tinyurl.com/m5d2hmbv.

[8] *Id.*

[9] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting [https://web.archive.org/web/20240510193253/https://www.facebook.com/business/ads/ad-targeting] (last visited July 7, 2025).

[10] *Easier, More Effective Ways to Reach the Right People on Facebook*, Meta, https://www.facebook.com/business/news/Core-Audiences. (last visited July 7, 2025).

[11] *What Is a Walled Garden?* Adjust, https://www.adjust.com/glossary/walled-garden/ (last visited July 7, 2025).

access. The combined ad revenue of these three companies exceeds the total ad revenue generated by all other ad tech firms."[12]

17. For example, on a typical website, the website controls which advertisements are shown to which users and contracts with third parties to access the website's data. However, publishers who choose to advertise on Meta do not control "who sees the ads and how the data is used"—Meta does.[13] A company "can create a targeted ad campaign on Facebook," but it cannot "export user data for use on other platforms."[14]

18. Because Meta collects significant personal information about its users, advertisers have "detailed insights into user behavior, preferences, and demographics" and are able to target users very precisely, "allowing for personalized and relevant ad campaigns that resonate with the target audience."[15]

19. Advertisers become reliant on Meta's "walled garden" which likely incentivized Meta to exploit Android's communication channels to collect additional information it should not have in order to make its data more valuable.

20. Advertisers can also build "Custom Audiences."[16] These enable advertisers to reach "people who have already shown an interest in [their] business" via the businesses app or website.[17] Custom Audiences allow advertisers to target existing customers directly or build "Lookalike Audiences," by "leveraging information such as demographics, interests, and behavior from [their] source audience to find new people who share similar qualities."[18] In order

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *About Custom Audiences*, Meta, https://www.facebook.com/business/help/ 744354708981227 [https://web.archive.org/web/20200124032553/https://www.facebook.com/business/help/744354708981227] (last visited July 7, 2025).
[17] *Ad Targeting, Help Your Ads Find the People Who Will Love Your Business*, Meta, https://www.facebook.com/business/ads/ad-targeting [https://web.archive.org/web/20210429005134/https://www.facebook.com/business/ads/ad-targeting]. (last visited July 7, 2025).
[18] *About Lookalike Audiences*, Meta, https://www.facebook.com/business/help/164749007013531 [https://web.archive.org/web/20200423171814/https://www.facebook.com/business/help/164749007013531] (last visited July 7, 2025).

to build these audiences, advertisers must first supply Meta with the underlying data by uploading it or by using Meta's "Business tools,"[19] including the Pixel.

21. Meta offers the Pixel as a "snippet of JavaScript code"[20] advertisers can integrate into their websites to track "people and they types of actions they take."[21]

22. On all websites where the Pixel operates, when a user exchanges information with the host of that site, Meta's software script surreptitiously directs the user's browser to send a separate message to Meta's servers. This second, secret transmission contains the original request sent to the host website, ("GET request"), along with additional data that the Pixel is configured to collect ("POST request").[22] GET and POST requests are communications that contain contents from both the user and from servers associated with the website the user is visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website.

23. Therefore, when a user communicates with a website, those communications are simultaneously and contemporaneously duplicated and sent to Meta at the same time as they are sent to the website.

24. Meta touts the Pixel's ability to collect anything present in http headers, including "IP addresses, information about the web browser, page location, document, referrer and person using the website"; button click data including "any buttons clicked by site visitors, the labels of

---

[19] *Create A Customer List Custom Audience*, Meta, https://www.facebook.com/business/help/170456843145568 [https://web.archive.org/web/20191225173733/https://www.facebook.com/business/help/170456843145568] (last visited July 7, 2025); *Create a Website Custom Audience*, Meta, https://www.facebook.com/business/help/147466220274834 [https://web.archive.org/web/20200505042157/https://www.facebook.com/business/help/14746622027483411] (last visited July 7, 2025).

[20] *Meta for Developers: Meta Pixel*, Meta, https://developers.facebook.com/docs/meta-pixel/ (last visited July 7, 2025) [hereinafter *Meta Pixel*]; *Retargeting: Inspire People to Rediscover What They Love About Your Business*, Meta, https://www.facebook.com/business/goals/retargeting [https://web.archive.org/web/20220607042345/https://www.facebook.com/business/goals/retargeting] (last visited July 7, 2025) [hereinafter *Retargeting*] (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.")

[21] *See Retargeting*, *supra* n. 20.

[22] Surya Mattu et al., *How We Built a Meta Pixel Inspector*, The Markup, (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector ("Blacklight, our real-time web privacy inspector, found that more than 30 percent of popular websites embed the Meta Pixel.").

those buttons and any pages visited as a result of the button clicks,"; for field names and values if selected by the website owner; and other optional values.[23] The Pixel captures at least seventeen standard events including payment information, registration for events, location search information, purchases, scheduling information such as appointments, what information was searched for, applications, and what content was viewed.[24]

25. After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

26. Meta's other Business Tools such as the Facebook SDK and the Conversions API function similarly to collect and match advertisers' data to Facebook users.[25]

27. The Facebook SDK allows advertisers to track events on native mobile apps so they can "measure ad performance and build audiences for ad targeting."[26]

28. Conversions API is a server-side tracking technology allowing Meta to bypass browser tracking and collect data directly from advertisers' servers (server events).[27] Meta encourages advertisers implementing the Pixel to implement Conversions API as well.

29. Meta confirms in its "Meta business Tools Terms,"[28] that it has the capability to use information it collects for purposes other than recording it and conveying it to websites. For example, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to

---

[23] *See Meta Pixel*, *supra* n. 20.

[24] Casandra Campbell, *How to Set Up and Use Meta Pixel (Formerly Facebook Pixel),* Shopify (Jun. 6, 2024), https://www.shopify.com/blog/72787269-relax-advertising-on-facebook-just-got-a-lot-easier.

[25] *Conversions Api: Verifying Your Setup*, Meta, https://developers.facebook.com/docs/ marketing-api/conversions-api/verifying-setup [https://web.archive.org/web/20240403072305/https://developers.facebook.com/docs/marketing-api/conversions-api/verifying-setup] (last visited July 7, 2025).

[26] *App Events API*, Meta, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited July 7, 2025).

[27] *Conversions API*, Meta, https://developers.facebook.com/docs/marketing-api/conversions-api ("The Conversions API is designed to create a connection between an advertiser's marketing data … from an advertiser's server [] … to Meta systems.") (last visited July 7, 2025).

[28] Meta Business Tools Terms, Meta, https://m.facebook.com/legal/businesstech (last visited July 7, 2025).

provide and improve the Meta Products." Therefore, Meta can use the wiretapped information for its own "research and development," and to "protect" its own products and services.

30. Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[29]

31. Additionally, Meta can use the event data to help websites "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[30]

32. Meta can also use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[31]

33. As such, Meta can and likely does use the information it wiretaps for purposes other than simply providing it to websites.

**B. Meta Exploits Android Communication Channels to Collect and De-Anonymize Users' Browsing Information.**

34. As discussed, Meta owns and operates the Pixel, which is integrated into the code of over 5.9 million websites.[32]

35. Generally, when a user visits a website where the Pixel is embedded, Meta collects via the Pixel the browsing information of the user: (i) the detailed URL strings of the webpages or articles the user viewed or read, (ii) what items, products, articles, etc. the user searched for in a search bar, and (iii) what actions the user took on a page. Also collected in the same transmission via cookies is the user's unique Facebook ID specifically identifying the user's Facebook account which includes the user's name and photos, among other personal information.

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Christina Newberry, *What Is the Meta Pixel, and How Do You Make the Most of It?* HOOTSUITE (Feb. 10, 2025) https://blog.hootsuite.com/meta-pixel/.

36. Cookies are "small text file[s] created by a website [and] stored in the user's computer.[33] Some cookies are temporary and some are permanent – persistent.[34] Persistent cookies "track user behavior across different sites [and] store information including geographic location, device specifications, and specific actions taken on the website."[35]

37. Meta collects the information stored in the cookies on a user's computing devices when a user visits any Meta Product, products provided by other members of Meta Companies, or websites or apps using Meta products. This includes advertisers who integrate the Pixel, CAPI, or Facebook SDK into their websites or apps.[36]

38. Essentially, through its Pixel, Meta places cookies on a user's computing device allowing Meta to follow the user's web browsing activities across other websites with the Pixel or other Meta Product integrated.

| Cookie | Purpose | Lifespan |
| --- | --- | --- |
| c_user | Contains the user's unencrypted Facebook ID[37] | 365 days[38] |
| datr | Uniquely identifies a user's browser[39] | 400 days[40] |
| fr | Uniquely identifies a user's browser + contains the user's encrypted Facebook ID[41] | 90 days[42] |
| _fbp | Identifies browsers to provide advertising and analytics services[43] | 90 days[44] |

[37] Cookie Compliance, Microsoft, (July 25, 2024) https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user. Description[:] Cookie contains the user ID of the currently signed-in user.").
[38] Cookies & Other Storage Technologies, Meta (Dec. 12, 2023) https://www.facebook.com/policy/cookies/.
[39] *Id.*. ("'Datr' is a unique identifier for your browser.").
[40] *Id.*
[42] _fbp Cookie: All The Information You Need, CaptainCompliance (Mar. 15, 2025) https://captaincompliance.com/education/_fbp/.

39. When a user accesses a website while logged into Facebook, the Pixel compels the user's browser to transmit multiple cookies, including the c_user, datr, fr, and fbp[45] cookies:

40. For Android users, however, Meta collects even more data.

41. Typically, websites and mobile apps operate in sandboxes on Android phones where they are unable to interact with each other and "have limited access to the [operating system. For example,] if app A tries to read app B's data or dial the phone without permission, it's prevented from doing so because it doesn't have the appropriate default user privileges."[46]

42. The way Android phones are designed, apps on the phones are not supposed to be able to access data collected from or on websites on the phone, and vice versa. "You run everything in a sandbox, and there is no interaction within different elements running on it."[47] This "cut[s] off access to sensitive data or privileged system resources."[48]

---

[38] Cookies & Other Storage Technologies, Meta (Dec. 12, 2023) https://www.facebook.com/policy/cookies/.
[39] *Id.*. ("'Datr' is a unique identifier for your browser.").
[40] *Id.*
[41] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").
[42] _fbp Cookie: All The Information You Need, CAPTAINCOMPLIANCE (Mar. 15, 2025) https://captaincompliance.com/education/_fbp/.
[43] *Id.*
[44] *Id.*
[45] The _fbp cookie is transmitted as a first party cookie.
[46] Application Sandbox, Android, https://source.android.com/docs/security/app-sandbox.
[47] Goodin, *supra* n. 2.
[48] *Id.*

43. However, Meta "abus[ed] legitimate Internet protocols [and platform capabilities], causing Chrome and other browsers [on Android mobile phones] to surreptitiously send unique identifiers to native apps installed on a device."[49] This allowed Meta to "bypass core security and privacy protections" and "pass cookies or other identifiers from [websites with the Pixel loaded on] Firefox and Chromium-based browsers to native Android apps for Facebook [and] Instagram…apps, tying that vast browsing history to the account holder logged into the app."[50]

*Figure 1*




44. In short, when an Android user accesses a website on their mobile device where the Pixel is installed (and if the Facebook or Instagram app is installed on the phone) Meta shares the fbp values generated on the web browser to tie the user's browsing information with the native apps where the user is logged in. This effectively de-anonymizes users and their web browsing activities on websites containing these trackers.[51]

45. Once Meta collects this additional information it ties the browsing information to PII like a user's full name, e-mail address, and other contact information provided on Facebook and Instagram profiles that are not anonymous.

---

[49] *Id.*
[50] *Id.*
[51] Goodin, *supra* n. 2.

46. Meta does so because its advertising business depends on compiling as much data about users as possible to enable the greatest precision for ad targeting, thus profiting considerably from this data collection.

47. Notably, Meta specifically targets "only Android users" through this process.[52]

48. The flow of Meta's process is below:

a. The user opens the native Facebook or Instagram app, which eventually is sent to the background and creates a background service to listen for incoming traffic on a TCP port (12387 or 12388) and a UDP port (the first unoccupied port in 12580-12585). Users must be logged in with their credentials on the apps.
b. The user opens their browser and visits a website integrating the Pixel.
c. The Pixel script is then loaded and the _fbp cookie is sent to the native Instagram or Facebook app via WebRTC (STUN) SDP Munging.
d. The Pixel script also sends the _fbp value in a request to https://www.facebook.com/tr along with other parameters such as page URL (dl), website and browser metadata, and the event type (ev) (e.g., PageView, AddToCart, Donate, Purchase).
e. The Facebook or Instagram apps receive the _fbp cookie from the Meta JavaScripts running on the browser and transmit it to the GraphQL endpoint (https://graph[.]facebook[.]com/graphql) along with other persistent uder identifiers, linking users' fbp ID (web visit) with their Facebook or Instagram account.[53]

---

[52] *Id.*
[53] *Id.*




*Figure 2*

49. Meta inserted _fbp cookie content into "a real-time peer-to-peer communication protocol commonly used for making audio or video calls in the browser," "caus[ing] the browser to send that data…to the Android local host, where the Facebook or Instagram app can read it and link it to the user."[54]

**C. Android Users Do Not Consent to Meta's Conduct and neither do Websites Implementing the Pixel.**

50. Meta's cookie and privacy policies do not disclose that Meta is linking Android users' browsing information to their Facebook and Instagram accounts. Indeed, common sense

---

[54] *Id.*

would dictate the opposite, given such linkage goes against general security and sandboxing settings on Android phones.

51. Further, this linkage occurs even if users are "not logged in to Facebook [or] Instagram . . . on their mobile browsers," "use[] Incognito Mode," or "clear[] their cookies or other browsing data."[55] Thus, Meta's tracking "defeats Android's inter-process isolation and tracking protections based on partitioning, sandboxing, or clearing client-side state."[56] And, given the way Android operating systems typically work, a reasonable user would not read Meta's policies (to the extent they have notice of and assent to them, which is disputed) to disclose this conduct.

52. Notably, *even websites* were not aware of and do not consent to Meta's conduct. Again, what Meta is doing is in breach of typical Android security protocols. And, in fact, there have been "several complaints from puzzled website owners questioning why Meta Pixel communicates with localhost in Facebook developer forums by September 2024" with "[n]o official response from Meta representatives."[57] This suggests that website developers were unaware of what Meta was doing and did not consent to Meta's conduct.

53. Further, pursuant to its terms, Meta is only supposed to collect information that websites configure the Pixel to collect. Therefore, a website operator can configure Meta's Pixel to transmit non-sensitive information but theoretically prevent the Pixel from collecting sensitive or non-anonymous information. However, per the above breach of Android protocols by Meta, the Pixel collects de-anonymized information, *regardless* of any configuration settings by the website.

54. On top of this, Meta changed protocols between September 2024 and the present (from HTTP to Websocket and STUN) to make it harder for web developers to detect.[58]

[55] *See* Girish et. al., *supra* n. 1.
[56] *Id.*
[57] *Id.*
[58] *Id.*

55. Furthermore, Google confirmed Meta's "behavior violates the terms of service for its Play marketplace and the privacy expectations of Android users":

> The developers in this report [Meta] are using capabilities present in many browsers across iOS and Android in unintended ways that blatantly violate our security and privacy…We've already implemented changes to mitigate these invasive techniques and have opened our own investigation and are directly in touch with the parties.[59]

56. Google, developer and owner of Android, believes Meta's practices violate Google's own policies and is working to block further violations by Meta.

**PLAINTIFF'S EXPERIENCE**

57. From September 2024 to the present, Plaintiff Charles visited several websites on her Android mobile phone where the Pixel was installed, including aarp.org. These websites are among those affected by Meta's practices described herein.

58. When Plaintiff visited these websites on her Android phone, Plaintiff was located in California and had the Facebook and Instagram applications installed on her phone.

59. Unbeknownst to Plaintiff, when she visited these websites, Meta tied her browsing information to the information on her Facebook and Instagram profiles in real-time, de-anonymizing and identifying her and her browsing information in real-time.

60. Meta compiled all of this information to create a comprehensive profile of Plaintiff in its databases which it uses for advertising. Based on Meta's invasive privacy practices, Plaintiff's data became more valuable for Meta based on its identifiability.

61. Plaintiff was not aware of nor did she consent to Meta's conduct.

**CLASS ALLEGATIONS**

62. Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of the following Class:

[59] Goodin, *supra* n. 2.

> All Android users in the United States with a Facebook or Instagram account who (i) have the Facebook or Instagram app installed on their Android phone, (ii) visited a website with the Pixel installed on their Android mobile phones between September 2024 and June 2, 2025, and (iii) had their browsing information collected by Meta.

63. California Subclass: Plaintiff also seeks to represent a subclass of similarly situated individuals defined as follows:

> All Android users in California with a Facebook or Instagram account who, while in California (i) have had the Facebook or Instagram app installed on their Android phone, (ii) visited a website with the Pixel installed on their Android mobile phones between September 2024 and June 2, 2025, and (iii) had their browsing information collected by Meta.

64. Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

65. **Numerosity**—Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of members of the Classes is unknown to Plaintiff at this time. However, it is estimated that there are tens or hundreds of millions of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

66. **Typicality**—Plaintiff's claims are typical of the claims of the Classes. Plaintiff, like all Class members, has an Android mobile phone, a Facebook or Instagram account, the Facebook or Instagram applications installed on her Android mobile phone, visited a website where the Pixel was installed, and had her information collected and de-anonymized by Defendant for advertising purposes using the methods described herein.

67. **Adequacy of Representation**—Plaintiff will fairly and adequately represent the interests of the members of the Classes. Plaintiff's interests coincide with and are not antagonistic

to those of the members of the Classes. Plaintiff has retained competent counsel experienced in complex class action privacy litigation and who will vigorously prosecute this action on behalf of the members of the Classes.

68. **Commonality/Predominance**—Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendants have acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include

i) Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

ii) Whether Defendant acted intentionally in violating Plaintiff's and Class members' privacy rights under the CIPA and the ECPA;

iii) Whether Defendant was unjustly enriched as a result of its violations of Plaintiff's and Class members' privacy rights; and

iv) Whether Plaintiff and Class members are entitled to damages under the CIPA or the ECPA.

69. **Superiority—**A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would entail.

## CAUSES OF ACTION

## COUNT I

## Intrusion Upon Seclusion

## (On Behalf of Plaintiff and Class Members)

70. Plaintiff incorporates and realleges the above factual allegations as if fully alleged herein.

71. Plaintiff and Class members have a reasonable expectation of privacy in their communications, identities, personal activities, and other data that would remain confidential.

72. By conducting its widespread surveillance, Meta intentionally invaded Plaintiff's and Class members' privacy rights as well as intruded on Plaintiff's and Class members' seclusion. They have an interest in (i) precluding dissemination and/or misuses of their communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

73. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

74. Meta was enriched through its collection of data because users' browsing information became more valuable when Meta exploited the Android communication channels to tie the browsing information to users' identities.

75. Meta also profited from its invasive surveillance of Android users through sales of targeted advertising.

76. Meta obtained Plaintiff's and Class members' information under false pretenses and/or exceeded its authority to obtain such information.

77. As a result of Meta's actions, Plaintiff and Class members suffered harm and injury, including but not limited to an invasion of their privacy rights.

78. Plaintiff and Class members have been damages as a direct and proximate result of Meta's invasion of their privacy and are entitled to just compensation, including monetary damages.

79. Plaintiff and Class members seek all relief available from common law invasion of privacy as well as such other relief as the Court may deem just and proper.

**COUNT II**

**Violation of CIPA**

**Cal. Penal Code § 631(a)**

**(On Behalf of Plaintiff and the California Subclass)**

80. Plaintiff incorporates and realleges the above factual allegations as if fully alleged herein.

81. The California Invasion of Privacy Act is codified at Cal. Penal Code §§ 630–38 ("CIPA") and was enacted to protect the privacy of Californians: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." CIPA § 630.

82. Under Cal. Penal Code § 631(a), Plaintiff need establish Defendant "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

83. To avoid liability under CIPA 631(a), a defendant must show it had the consent of all parties to a communication and that such consent was procured prior to the interception occurring.

84. Meta's Pixel is a "machine, instrument, contrivance, or …other manner" used to engage in the prohibited conduct at issue here.

85. Defendant is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Meta also has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operator. Accordingly, Defendant is a third party to any communication between Plaintiff and California Subclass Members and any of the websites at issue here. *Id*. at 521.

86. Under Cal. Penal Code § 637.2, Plaintiff and Class members may seek injunctive relief and statutory damages of $5,000 per violation.

87. Meta willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiff and Class members with the websites at issue, while the electronic communications were in transit or were being sent from or received at any place within California.

88. Meta intercepted communications through the signals sent on the Android communication channels and used all this information to build user profiles and comprehensive audiences for advertisers. Meta sold access to the audiences to advertisers for a profit.

89. Neither Plaintiff nor California Subclass members consented to Meta's practices described herein.

90. The interception of Plaintiff and California Subclass members' data occurred in California where Plaintiff and California Subclass members accessed websites with the Pixel installed and where Meta exploited the Android communication channels to de-anonymize and identify Plaintiff and California Subclass members. Defendant also routed Plaintiff's and

California Subclass members electronic communications with various websites to Defendant's servers, in California.

91. Pursuant to Cal. Penal Code 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA and seek statutory damages as provided under CIPA for each of Defendant's violations.

**COUNT III**

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code § 635**

**(On Behalf of Plaintiff and the California Subclass)**

92. Plaintiff incorporates and realleges the above factual allegations as if fully alleged herein.

93. CIPA § 635(a) prohibits an entity from "manufactur[ing], assembl[ing], sell[ing], offer[ing] for sale, advertis[ing] for sale, possess[ing], transport[ing], import[ing], or furnish[ing] to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another."

94. Both the Pixel and Meta's code used to tie users' communications with websites to their identities are "devices" "primarily or exclusively designed or intended for eavesdropping upon the communication of another."

95. Meta manufactured, assembled, advertised, or offered for sale and possessed these devices.

96. Meta's use of these devices on various websites that Plaintiff and California Subclass members visited caused Plaintiff and California Subclass members real and concrete harm, including but not limited to Meta's unjust enrichment and the loss of control of their personal information.

97. Neither the Plaintiff nor the Class members provided their prior consent to the Defendant's manufacturing or use of the wiretapping devices.

98. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT IV**

**Unjust Enrichment**

**(On Behalf of Plaintiff and Class Members)**

99. Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

100. Plaintiff brings this claim pursuant to California law.

101. Meta has wrongfully and unlawfully trafficked Plaintiff's and Class members' personal information and other personal data without their consent and profited substantially.

102. Plaintiff's and Class members' personal information and data have conferred an economic benefit on Meta as its unauthorized exploitation of Android communication channels to link Facebook and/or Instagram accounts with browsing activity, rendering the browsing activity de-anonymous and identifiable makes the data Meta collects more valuable to advertisers.

103. Meta has been unjustly enriched at the expense of Plaintiff and Class members and has unjustly retained the benefits of their unlawful and wrongful conduct.

104. It would be inequitable and unjust for Meta to retain any of the proceeds from its unlawful and wrongful conduct.

105. Defendant was aware of the benefits conferred by Plaintiff and Class members. Indeed, Meta deliberately exploited the Android communication channels to link browsing information to Facebook and Instagram profiles. Defendant therefore acted in conscious disregard of the rights of Plaintiff and Class members and should be required to disgorge all profit obtained therefrom to deter Meta and others from committing the same unlawful actions again.

**<u>Count V</u>**

**Violation of the California Invasion of Privacy Act,**

**Cal. Penal Code § 638.51(a)**

106. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

107. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

108. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

109. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

110. In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

111. For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is incoming information that is being sent to that same user.

112. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced however, courts have expanded the application of these surveillance devices. This, combined with the California Supreme Court's mandate to read provisions of the CIPA broadly to protect privacy rights, has led courts to apply CIPA § 638.50 to internet tracking technologies.

*See*, *e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

113. The code Meta installs on Android users' browsers that enables Meta to tie users' communications with their Facebook or Instagram profiles is a "device or process" that ""identifies the source of visitors to [] website[s]," and is therefore a "pen register." *Heiting v. FKA Distributing Co.*, 2025 WL 736594, at *3 (C.D. Cal. Feb. 3, 2025); see also *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

114. In the alternative, this code is a "trap and trace device" because it is a "device or process" that "identif[ies] the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" (i.e.,

115. Plaintiff and California Subclass Members who are communicating with websites and are being de-anonymized by Meta's code).

116. At all relevant times, Defendant installed or used the pen register or trap and trace device on various websites and the Android communication channels, enabling Defendant to de-anonymize and identify Plaintiff and California Subclass Members by tying their browsing information to their Facebook and Instagram profiles.

117. Neither Plaintiff nor California Subclass Members provided their prior consent to Defendant's installation or use of the pen register or trap and trace device. Nor did Defendant obtain a court order enabling it to do the same.

118. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

**<u>Count VI</u>**

**Violation of the Electronic Communications Privacy Act**

**18 U.S.C. §§ 2511(1), *et seq***

119. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

120. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

121. The ECPA protects both the sending and the receipt of communications.

122. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter

123. The transmission of Plaintiff's and members of the Classes' website page visits, browsing and search information, and persistent identifiers each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

124. The transmission of this information between Plaintiff and members of the Classes, on the one hand, and each website with which they chose to exchange communications, on the other hand, are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

125. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

126. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

127. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication." 18 U.S.C. § 2510(5).

128. The following instruments constitute "devices" within the meaning of the ECPA:

a. The Meta Tracking Pixel;

b. The code that enabled Meta to link browsing information with Facebook and Instagram profiles; and

c. Any other tracking code or SDK used by Defendant.

129. Plaintiff and members of the Classes' interactions with each website are electronic communications under the ECPA.

130. By utilizing the methods described herein, Defendant intentionally intercepted and/or endeavored to intercept the electronic communications of Plaintiff and members of the Classes in violation of 18 U.S.C. § 2511(1)(a).

131. Defendant then monetized and thus used the intercepted communications for advertising purposes. By intentionally using, or endeavoring to use, the contents of Plaintiff's and members of the Classes' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

132. Defendant was not acting under the color of law to intercept Plaintiff's and members' of the Classes' electronic communications.

133. Plaintiff and members of the Classes did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy.

134. Plaintiff and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data for advertising purposes without their knowledge or consent.

135. The websites Plaintiff and members of the Classes visited did not authorize or consent to Defendant's conduct, given Defendant's conduct constituted an abuse of Android security protocols and a violation of Google's terms.

136. The foregoing acts and omissions therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

137. As a result of every violation thereof, on behalf of themselves and the members of Classes, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2510, et seq. under 18 U.S.C. § 2520.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Classes, respectfully requests that this Court:

i. Enter an order certifying the proposed Class and California Subclass pursuant to Federal Rule of Civil Procedure 23, naming Plaintiff representative of the Classes, and naming Plaintiff's attorneys Class Counsel to represent the Classes;

ii. Enter an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

iii. Award compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

iv. Award pre- and post- judgment interest on all amounts awarded;

v. Award Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit;

vi. Enter an order for injunctive and declaratory relief; and

vii. Grant such other and further legal and equitable relief as the court deems just and equitable.

**JURY DEMAND**

Plaintiff, on behalf of herself and the Classes, demands a trial by jury of any and all issues in this action so triable of right.

Dated: July 8, 2025

Respectfully submitted,

*/s/ Joseph Henry (Hank) Bates, III*

Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorney for Plaintiff and the Class*